ESTATE OF Mary F. UNDERWOOD,
Appellant/Cross–Appellee,

v.

NATIONAL CREDIT UNION ADMIN-
ISTRATION, et al., Appel-
lees/Cross–Appellants.

Nos. 92–CV–840, 92–CV–936.

District of Columbia Court of Appeals.

Argued June 6, 1995.
Decided Aug. 31, 1995.

Warren K. Kaplan, with whom Solaman G. Lippman and Richard H. Semsker were on the brief, Washington, DC, for appellant/cross-appellee.

F. Joseph Nealon, with whom Marianne P. Eby and Constantinos G. Panagopoulos were on the brief, Washington, DC, for appellee/cross-appellant National Credit Union Administration.

Joseph A. Artabane, with whom W. Neil Belden was on the brief, Washington, DC, for appellee/cross-appellant Charles West.

Woodley B. Osborne, Washington, DC, submitted a brief for amicus curiae, Metropolitan Washington Employment Lawyers Association.

Before FERREN, TERRY, and STEADMAN, Associate Judges.

Opinion for the court by Associate Judge FERREN.

Opinion concurring in part and dissenting in part by Associate Judge STEADMAN at p. 649.

FERREN, Associate Judge:

This case presents the following questions: (1) whether this court has jurisdiction over plaintiff's appeal of a judgment notwithstanding the verdict (j.n.o.v.) in an action for sexual harassment and for intentional infliction of emotional distress against a credit union, where the credit union, after judgment, was placed in the hands of a liquidating agent, the National Credit Union Administration (NCUA), and appellant did not, at that point, initiate a federal administrative remedy before pursuing this appeal; (2) if this court has jurisdiction, whether the trial court erred in granting the j.n.o.v. on the ground that the Worker's Compensation Act (WCA) provided the exclusive remedy for appellant's emotional distress claim against the credit union; (3) if the WCA was not the exclusive remedy, whether the evidence was sufficient to sustain appellant's emotional distress claims against the Credit Union and its board chairman; (4) if so, whether a new trial or other remedy is warranted on the issue of damages because the $425,000 verdict against the credit union is inconsistent with the jury's $10,000 verdict against the credit union's board chairman.

We conclude that we have jurisdiction; that the Workers' Compensation Act does not provide an exclusive remedy applicable here; that the evidence is sufficient to support appellant's emotional distress claim; and that the inconsistent verdicts—imposing a higher liability on the Credit Union than on

the only active tortfeasor, its board chairman—must be affirmed as to the board chairman and reinstated in full against the Credit Union (now NCUA) because the Credit Union waived its right to object to the verdict on grounds of inconsistency.

## I. *Statement of Facts*

At trial, plaintiff-appellant's evidence told the following story. The Washington Post Employees Federal Credit Union hired appellant, Mary F. Underwood, as Operations Manager/Bookkeeper in 1980 and promoted her to Chief Accountant in 1985. During the spring of 1985, Charles West, who was then a Director of the Credit Union, developed a romantic interest in appellant and extended her several invitations to go out of town with him. Appellant rejected these invitations for about 14 months.

In June 1985, West persuaded appellant to apply for the position of President/Manager of the Credit Union, and appellant obtained this position with West's help in July 1985. In her new position, appellant was called upon to work closely with West, who had been appointed the Chairman of the Credit Union's Board of Directors in February 1986 and acted as a liaison between appellant and the Board.

In September 1986, West and appellant developed a sexual relationship which lasted until January 1987. After the February 1987 Board meeting, appellant, who was married, told West that she did not want to continue their sexual relationship. · West, however, continued to extend invitations to appellant between March and September 1987. Appellant understood these invitations to be sexual in nature and rejected them. West became increasingly hostile and critical of appellant,

subjecting her to numerous incidents of anger, yelling and humiliation, some of which occurred in the presence of the Board of Directors or the staff.[1]

In September 1987, following a Board meeting where appellant had been singled out for praise by an NCUA examiner, West invited appellant to accompany him on a trip to Florida and, following her refusal, threatened that (1) he was going to do his own evaluation of appellant regardless of the NCUA examiner's praise; (2) he had already lined up some replacements for appellant; (3) he had the Board behind him and would use his influence with the Board to have appellant fired; (4) he was willing to lie to the Board about appellant. Subsequently, on October 1, 1987, West called a special meeting of the Board for the purpose of evaluating appellant.

The Board was aware that appellant suffered from sarcoidosis—a progressive lung disease that results in a debilitating shortness of breath after minimal exertion—and that appellant was under continuing stress from West.[2] Appellant's physical and emotional health continued to deteriorate during January and February of 1988, and appellant began feeling demoralized because her conflict with West had started affecting her staff's morale and productivity. West's continuing criticism made appellant's working conditions "impossible," and appellant, who had loved her job, began to dread going to work.

After returning from sick leave attributable to a lung infection, appellant learned that West was planning to exclude her from the March 3, 1988 Board meeting. When

---

1. According to appellant, early incidents included occasions when West (1) angrily berated appellant for consulting another director regarding the repossession of a motor vehicle; (2) slammed a door and angrily rejected appellant's request that he sign the NCUA 5300 report; (3) threatened appellant in saying she should not "go behind [his] back" after appellant called another Board member about a meeting she had missed; and (4) told appellant that the Board would have to "choose between [them]," and that she should be prepared to resign, if she dared to complain about West's habit of loitering around the Credit Union office during working hours.

2. At a Board meeting in January 1988, the Board members saw West berating appellant for 20 minutes for not having an adequate explanation in the newsletter about the change in the Credit Union's hours. After this meeting, appellant had conversations with a Board member and a member of the supervisory committee in which she asked for advice in dealing with her problems with West. Both members acknowledged the fact that appellant was subjected to continuing harassment by West, but the Board did nothing to investigate or correct the situation.

appellant decided to attend the meeting, West threw a box of papers at her feet and demanded that she take the material she had prepared for the meeting back to the Credit Union. He further humiliated her in front of the Board[3] by screaming at her to stop distributing packets. Once again, despite appellant's appeals to several Board members, the Board took no action to remedy the situation.[4]

Appellant's physical and emotional conditioned worsened during March 1988. A lung infection returned, and she grew depressed and frightened. At the March 24, 1988 Board meeting, appellant asked the Board for a leave of absence for up to 90 days to give her an opportunity to evaluate her health and pull herself together. In her request for leave, appellant included a detailed plan for interim management of the Credit Union. After meeting to consider appellant's request, West and another Board member met with appellant and told her that she could not come back to work until the Board said so and that she was no longer the manager. Appellant asked for a written statement as to her status; the statement was not delivered that day as promised.[5] On March 28, 1988, the Board voted to fire appellant and appellant was advised of this fact in a letter written on April 4, 1988, which she received on April 6, 1988.[6] Appellant was devastated by this news. Two days later, appellant called Board member Poff,

who, according to appellant's testimony, agreed that appellant's termination had been engineered and "was just the result of sexual harassment."

On October 20, 1988, appellant filed suit against the Credit Union and all its Board members, including West, seeking damages for (1) sexual harassment in violation of District of Columbia Human Rights Act, D.C.Code §§ 1–2501 to –2557 (1992 Repl.), and (2) intentional infliction of emotional distress, a common law tort. (Before trial, appellant dismissed the complaint against all Board members except West.)

At trial, appellant presented the testimony of Dr. Glenn Legler, a psychiatrist for twenty-two years, who opined that, as a result of her depression following her job termination, appellant became unable to cope with the demands of daily living and with the symptoms of sarcoidosis.[7] Appellant herself testified that, after her firing, she had become totally depressed and that she scarcely had left her apartment for over a year. She also testified that she had become unable to care for herself and that her husband had to take over all the household chores.

Appellant's condition deteriorated to the point that, in August 1989, she was hospitalized for two weeks for acute depression. At the time of trial, appellant had been under psychiatric care for depression for four years

---

3. According to appellant's testimony, when questioned about the March 3, 1988, meeting, Board member Whiffin replied that a person "would have to be blind not to see [West's] hostility." Board member Walsh said that he did not like the way West was treating appellant but could offer no solution. Board member Poteat told appellant that he was "concerned" about what was going on but that he "understood" the cause. Board member Poff offered to set up a meeting among West, appellant, and himself to try to resolve the problem, but no such meeting occurred.

4. Appellant testified:
 I felt that the Board was not at that point going to help me. I had been thinking all along that at some point they're going to stop Charlie.... But if he could do that and not even get a response from the Board, then, you know, I felt that I was going to be swallowed up, my whole—my job, my career, everything, he wanted to destroy it and he was going to.

5. Appellant suffered considerable stress from this incident. She experienced chest pains and her physician placed her on medication for angina and arranged for her to have an EKG stress test.

6. Appellant testified that her waiting for the Board's decision, especially after West's ambiguous statement that she could not come back to work, caused her considerable anxiety:
 I stayed in my apartment, I waited by the phone every day, because I figured that the Board would call me and give me a decision on the 90 day request that I had put in for my leave.... I was scared, because I didn't know what was happening.

7. Dr. Legler testified that this result developed in part from the stress to which appellant had already been subjected, from her fragile physical and emotional condition, and from the central role her work played in her life.

with no significant improvement for the immediately preceding one and a half years.

On January 28, 1992, after a nine-day trial, the jury returned a verdict for appellant on her emotional distress claims, awarding her damages of $10,000 against West and $425,000 against the Credit Union. The jury, however, rejected appellant's sexual harassment claims against both parties.

West and the Credit Union each moved for a j.n.o.v.[8] The trial court granted the Credit Union's motion on June 17, 1992, ruling that the Worker's Compensation Act, D.C.Code §§ 36–301 et seq. (1993 Repl.) (WCA), was appellant's exclusive remedy against the Credit Union, her employer, for the emotional distress claim. The court, however, allowed the $10,000 verdict against West to stand.

On July 1, 1992, acting under authority of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183,[9] NCUA placed the Credit Union in involuntary liquidation and appointed itself liquidating agent. See 12 U.S.C. § 1787(a)(1)(A). Two weeks later, on July 16, 1992, appellant Underwood appealed the trial court's order granting the j.n.o.v. Both the Credit Union and West cross-appealed on July 29, 1992. On August 18, NCUA filed a motion to substitute itself for the Credit Union as a party in this appeal. We granted the motion on October 10, 1992.

Pursuant to the requirements of 12 U.S.C. § 1787(b)(3)(B), NCUA published notices on September 21, 1992, October 21, 1992 and November 21, 1992, respectively, advising that the Credit Union was undergoing liquidation and that claimants had until December 21, 1992, to file claims against the Credit Union with NCUA. NCUA, however, failed to mail the notice to appellant individually as a "creditor" or "claimant" pursuant to § 1787(b)(3)(C).

Appellant did not file her claim with NCUA. Instead, she pursued her appeal in this court by filing her brief on November 29, 1993. NCUA and West filed their briefs on January 3 and 4, 1994, respectively. Also on January 3, 1994, NCUA filed a motion to dismiss Underwood's appeal, contending that this court lacked subject matter jurisdiction because Underwood had failed to exhaust her administrative remedy under 12 U.S.C. § 1787(b).[10]

## II. Subject Matter Jurisdiction

As an initial matter, we must rule on NCUA's motion to dismiss for lack of subject matter jurisdiction. Essentially, NCUA argues that Underwood failed to exhaust a required administrative remedy by failing to file a timely claim with NCUA under FIRREA.[11] This contention has no merit.

---

8. The Credit Union and West each moved for j.n.o.v. based on insufficiency of evidence to support a finding of intentional infliction of emotional distress. The Credit Union additionally moved for a j.n.o.v. on the ground that the Workers' Compensation Act was appellant's exclusive remedy against her employer.

9. FIRREA was signed into law on August 9, 1989, without a specified effective date, and is codified in various sections of 12 U.S.C. (Supp. II 1990). FIRREA provides the claims procedures against receivers or liquidating agents for banks (Federal Deposit Insurance Corporation or FDIC), savings and loan associations (Resolution Trust Corporation or RTC) and federal credit unions (National Credit Union Association or NCUA). See 12 U.S.C. §§ 1821 (FDIC claims), 1441a (RTC claims), and 1787 (NCUA claims). These provisions in the various code sections are identical in all material respects. Case law construing any of these provisions, therefore, applies with equal force to all comparable provisions.

10. Appellant Mary Underwood died on March 16, 1994 while her appeal was pending. On October 3, 1994, Larry Underwood, appellant's brother, filed a motion to substitute himself, as administrator of Mary Underwood's estate, as appellant/cross-appellee in this action. We granted this motion on December 22, 1994. For the sake of convenience, however, we shall refer to Mary Underwood as appellant.

11. Summarily, FIRREA provides:

1. Pursuant to 12 U.S.C. § 1787(b)(3)(B)(i), NCUA is required to "publish a notice to the credit union's creditors" for three consecutive months, asking them "to present their claims" to NCUA by a date specified in the notice (which must be at least 90 days after the first publication). NCUA also is required "to mail a notice similar to" the published notice "to any creditor shown on the credit union's books" and "upon discovery of the name and address of a claimant not appearing on the credit union's books." Id. § 1787(b)(3)(C).

In the first place, FIRREA became law on August 9, 1989, see *supra* note 10, approximately 9½ months after Underwood filed suit on October 20, 1988. There is, accordingly, a substantial basis for arguing that, since FIRREA has no retroactivity provision, FIRREA does not affect a lawsuit filed against a failed credit union before FIRREA became law. *See Landgraf v. USI Film Products,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (holding Civil Rights Act of 1991, which created right to recover compensatory and punitive damages for certain violations of Title VII of Civil Rights Act of 1964, did not apply to Title VII case pending on appeal when 1991 statute was enacted). *Landgraf* announced a presumption against retroactive application of legislation that Congress has not expressly given retroactive effect. *See id.* at —, —, —, 114 S.Ct. at 1497, 1501, 1505. Furthermore, the Court stated in particular that "[a] new rule covering the filing of complaints would not govern an action in which the complaint had already been properly filed under the old regime." *Id.* at — n. 29, 114 S.Ct. at 1502 n. 29; *see also F.D.I.C. v. Burrell,* 779 F.Supp. 998, 1003 (S.D.Iowa 1991) (applying *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), to hold "FIRREA is not applicable to this case as it became law a full three years after this action was brought").

But even if FIRREA does apply to this case, NCUA's motion to dismiss must fail. The question presented under FIRREA, see *supra* note 11, is whether a claimant must file a separate administrative claim with the liquidating agent or receiver, even though the claimant had filed a lawsuit against the failed financial institution before the agent or receiver was appointed. Some courts have answered "yes," holding that the claimant's failure to do so within the time limit prescribed by the published notice, see *supra* note 11 ¶ 1., results in a failure to exhaust administrative remedies that deprives the court of subject matter jurisdiction over the lawsuit. *See Bueford v. Resolution Trust Corp.,* 991 F.2d 481, 485 (8th Cir.1993); *Resolution Trust Corp. v. Mustang Partners,* 946 F.2d 103, 106 (10th Cir.1991); *Espinosa v. DeVasto,* 818 F.Supp. 438, 441 (D.Mass. 1993); *Green v. Resolution Trust Corp.;* 794 F.Supp. 409, 410–11 (D.D.C.1992); *New Maine Nat'l Bank v. Reef,* 765 F.Supp. 763, 766 (D.Me.1991); *United Bank of Waco v. First Republic Bank Waco,* 758 F.Supp. 1166, 1168 (W.D.Tex.1991).

Other courts, however, have understood FIRREA to create "a separate scheme for the handling of pre-receivership actions." *Whatley v. Resolution Trust Corp.,* 32 F.3d 905, 908 (5th Cir.1994). Under this reading, the pending lawsuit itself is deemed a FIRREA-filed claim which the receiver recognizes as such upon stepping into the shoes of the failed institution. *See Whatley,* 32 F.3d at 908–09; *Wilson v. F.D.I.C.,* 827 F.Supp. 120, 123–24 (E.D.N.Y.1993) (citing *Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp.,* 489 U.S. 561, 585, 109 S.Ct. 1361, 1374, 103 L.Ed.2d 602 (1989)). The receiver then has the option of treating the complaint as an administrative claim and seeking a stay of the litigation, see 12 U.S.C. § 1787(b)(12), or of foregoing the administrative route and proceeding directly with the

2. NCUA has authority to allow or disallow a filed claim, *see id.* §§ 1787(b)(5)(B) & (D), and shall do so within 180 days after the claim is filed. *See id.* § 1787(b)(5)(A)(i).

3. Untimely filed claims are to be disallowed, *see id.* § 1787(b)(5)(C)(i), except that NCUA "may" consider a late-filed claim if "the claimant did not receive notice of the appointment of the liquidating agent in time to file such claim before [the] date" specified in the notice, and "the claim is filed in time to permit payment of such claim." *Id.* § 1787(b)(5)(C)(ii).

4. If a claim is disallowed, § 1787(b)(5)(E) explicitly precludes judicial review, but, according to § 1787(b)(6)(A), the claimant has the option of seeking administrative review through NCUA or of pursuing a *de novo* judicial remedy by filing a lawsuit (or continuing a lawsuit brought before appointment of the liquidating agent) within 60 days of disallowance of the claim or, when NCUA has failed to act, within 60 days of the end of the 180–day claim determination period.

5. The statute expressly adds that, subject to § 1787(b)(12) granting the liquidating agent the right to ask for a 90–day stay of a pending court action, "the filing of a claim with the liquidating agent shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the liquidating agent." *Id.* § 1787(b)(5)(F)(ii).

lawsuit. *See Whatley*, 32 F.3d at 908–10.[12] A receiver's election to go ahead with the lawsuit would be the functional equivalent of a denial of the claim and a recognition of the claimant's right, in that case, to seek *de novo* judicial resolution of the claim under 12 U.S.C. § 1787(b)(6)(A). See *supra* note 11 ¶ 4.

The matter takes on a more serious dimension when, as in this case, the liquidating agent or receiver fails to mail the required individual notice to a known claimant under § 1787(b)(3)(C). See *supra* note 11 ¶ 1. Some courts have stressed that this default provides all the more reason to deem the lawsuit itself a FIRREA-filed claim, which the liquidator must either consider as such by asking for a stay of the litigation or else forego by proceeding with the lawsuit. *See Greater Slidell Auto Auction, Inc. v. American Bank of Baton Rouge*, 32 F.3d 939, 941 (5th Cir.1994). Other courts, while not deeming the lawsuit itself a FIRREA-filed claim, have ruled that the failure to mail the required notice at least tolls the period for filing administrative claims until the claimant receives official notice of the claim period and is given a reasonable opportunity to file. *See F.D.I.C. v. diStefano*, 839 F.Supp. 110, 118 (D.R.I.1993); *F.D.I.C. v. Updike Bros.*, 814 F.Supp. 1035, 1041 (D.Wyo.1993). All these courts have emphasized a constitutional concern: known claimants are entitled to individual notice of the administrative claim period; otherwise, a disallowance of the claim may deprive the claimant of a property right without due process. *See Greater Slidell*

*Auto Auction, Inc.*, 32 F.3d at 942 (citing *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 798–800, 103 S.Ct. 2706, 2711–12, 77 L.Ed.2d 180 (1983), and *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317–20, 70 S.Ct. 652, 658–60, 94 L.Ed. 865 (1950)); *diStefano*, 839 F.Supp. at 118; *Wilson*, 827 F.Supp. at 123–24; *Updike Bros.*, 814 F.Supp. at 1041.

■ Based on the case law interpreting FIRREA in light of this concern about constitutional due process, we are satisfied that—as to lawsuits (A) filed before a liquidating agent is appointed, (B) where the liquidator fails to mail the required individual notice to known claimants—the court will retain subject matter jurisdiction at least until the claimant receives formal notice of the administrative claim procedure and has an opportunity to respond.

In this case, upon NCUA's self-designation as liquidating agent for the Credit Union, *see* 12 U.S.C. § 1787(a)(1)(A), NCUA published the required first of three notices, *see id.* § 1787(b)(3)(B)(i), *supra* note 11 ¶ 1., on September 21, 1992, announcing that "all claims not filed by December 21, 1992, may be barred." NCUA, however, failed to mail the individual notice that Underwood was entitled to receive as a known claimant. *See id.* § 1787(b)(3)(C), *supra* note 11 ¶ 1.[13]

On January 3, 1994, over a year after the December 21, 1992 claim deadline had passed, NCUA filed its motion to dismiss. Eleven days later on January 14, 1994, Underwood filed a protective claim with NCUA,

12. The *Wilson* court would allow the lawsuit, filed before appointment of the receiver, to continue without requiring exhaustion of the administrative remedy. 827 F.Supp. at 125.

13. NCUA concedes that it did not mail appellant the individual notice to a "creditor" or "claimant" required by 12 U.S.C. § 1787(b)(3)(C). NCUA contends that it had no obligation to do so, however, because Underwood was not a "creditor shown on the credit union's books," 12 U.S.C. § 1787(b)(3)(C), and, in any event, because the Credit Union (in the words of NCUA's brief) "was not liable to appellant at the time NCUA filed its motion to substitute itself as the proper party in interest." NCUA's contention is frivolous. NCUA was required to mail a notice to any "claimant not appearing on the credit union's books within 30 days after the discovery

of such [claimant's] name and address." *Id.* § 1787(b)(3)(C)(ii). There can be no question that NCUA was aware of Underwood's claim against the Credit Union.

> In cases where suit has already been filed against a depository institution before the FDIC is appointed receiver, the FDIC receives notice of those claims "when it steps into the shoes of the failed [institution] and takes control of its assets."

*Espinosa*, 818 F.Supp. at 442 (quoting *Coit Independence Joint Venture*, 489 U.S. at 585, 109 S.Ct. at 1374). In this case, NCUA stepped into the Credit Union's shoes on July 1, 1992 and filed a motion to substitute itself as a party on August 18, 1992. As a result, NCUA was deemed *on notice* of Underwood's claim and was obliged to mail her notice pursuant to § 1787(b)(3)(C)(ii).

which has acknowledged that it disallowed the claim as untimely filed.

Under this scenario, whether we say that Underwood's lawsuit itself was a claim filed with NCUA at the moment NCUA stepped into the Credit Union's shoes as liquidating agent in July 1992, or that the claim deadline was tolled until Underwood received official notice (through NCUA's motion to dismiss) in January 1994 and promptly filed her claim with NCUA, the fact is that NCUA disallowed her claim—either through inaction during the 180–day period after the claim period expired on December 21, 1992, or through express rejection of the claim filed on January 14, 1994. For either reason, therefore, it follows that Underwood is free to pursue her lawsuit—and thus her appeal—without obligation to exhaust administrative remedies. *See* 12 U.S.C. § 1787(b)(6)(A), *supra* note 11 ¶ 4.

### III. *Alleged Exclusivity of the Workers' Compensation Act*

Appellant challenges the trial court's ruling that the Workers' Compensation Act (WCA) is her exclusive remedy against the Credit Union for her claim of intentional infliction of emotional distress. In the following discussion we conclude:

1. Unless a claimant's injuries "clearly are not compensable" under the WCA—*i.e.*, when there is a "substantial question" whether the WCA applies—the administrative agency charged with administering workers compensation claims, the Department of Employment Services (DOES), not the Superior Court, has primary jurisdiction over employment-related claims by private employees who allege disabilities attributable to intentional infliction of emotional distress.

2. The fact that appellant's common law tort claim for emotional distress is premised on the same events that underlie her Human

Rights Act claim for sexual harassment profoundly affects the analysis. As a result, her alleged disability "clearly" falls outside the WCA definition of disabling injuries as a matter of law, and appellant is thus free to file suit for emotional distress in Superior Court rather than submitting that claim to DOES.

3. The analysis is reinforced by considerations of judicial economy that disfavor claim splitting. In particular, dividing jurisdiction over two claims based on the same events between an administrative agency and the trial court would create problems of issue preclusion, inconvenience, and unnecessary expense.

4. Granting DOES primary jurisdiction over appellant's emotional distress claim also would have a chilling impact on enforcement of the Human Rights Act policy prohibiting sexual harassment. Involvement of DOES not only would create claim-splitting problems but also would delegate jurisdiction to an administrative agency not used to dealing with sexual harassment issues, and would apply a statute that severely caps financial recovery in an area where the legislature has indicated a strong preference for compensatory and punitive damages.

### A.

The WCA provides a comprehensive scheme for compensating private sector employees for their work-related injuries. It makes the employer liable without fault if the employee's occupational injury or death falls within the scope of the Act, *see* D.C.Code § 36–303; *Grillo v. National Bank of Washington*, 540 A.2d 743, 748 (D.C.1988), but as a *quid pro quo* for such automatic liability the Act provides the employee's exclusive remedy—an administrative remedy—against the employer for injuries within its reach. *See id.* § 36–304(a); *Grillo*, 540 A.2d at 748.[14]

---

14. Public sector employees are covered by the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–624.2 to –624.46 (1992 Repl.), which is "conceptually close to the WCA." *District of Columbia v. Thompson*, 570 A.2d 277, 286 (D.C.1990) (*Thompson I*), aff'd in part and vacated in part, 593 A.2d 621, 635–36 (D.C.1991) (*Thompson II*), cert. denied, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991). The CMPA establishes disability proceedings (similar to the WCA) and personnel grievance procedures, each of which provides an exclusive remedy for injuries within its scope. Statutory language makes the disability provisions exclusive, *see* D.C.Code § 1–624.16(c); judicial interpretation does the same for the personnel provisions, *see Thompson II*, 593 A.2d at 635.

The issue, therefore, is whether appellant's emotional distress claim is compensable under the WCA and thus is not eligible for a lawsuit in court.

 We have held that, when there is a "substantial question" whether the WCA applies, the administrative agency charged with implementing the statute, given its special expertise, has "primary jurisdiction" to "make the initial determination concerning coverage" before the courts can exercise jurisdiction. *Harrington v. Moss*, 407 A.2d 658, 661 (D.C.1979). We elaborated that, when an injury occurs during the performance of an employee's duties, "a substantial question will exist," and thus the agency will have primary jurisdiction, "unless the injuries were *clearly* not compensable under the statute." *Id.* (citation and internal quotation marks omitted). Thus, the trial court's jurisdiction over appellant's common law emotional distress claim depends on whether we can say, as a matter of law, that her claim is "clearly" outside WCA coverage.

As important background for this inquiry we note, first, that no one contends that the WCA can preempt the trial court's jurisdiction over a statutory claim of on-the-job sex discrimination (including sexual harassment) under the D.C. Human Rights Act—the kind of claim the jury rejected in this case. *See* D.C.Code § 1–2556 (private cause of action under Human Rights Act); *Howard Univ. v. Best*, 484 A.2d 958, 982 (D.C.1984) (holding university faculty member's lawsuit based on actions by college Dean established prima facie case of sexual harassment under Human Rights Act); *cf. King v. Kidd*, 640 A.2d 656, 664 (D.C.1993) (holding Superior Court had jurisdiction to hear public employee's statutory "sexual harassment claim" and "interrelated or 'pendent' tort claim" for intentional infliction of emotional distress based on sexual harassment). Appellee NCUA, therefore, implicitly accepts the trial court's jurisdiction over appellant's sexual harassment lawsuit under the Human Rights Act and the resulting jury verdict for the Credit Union. NCUA then argues, however, that because this case no longer contains a statutory sexual harassment claim, the WCA—the

only statute now in the picture—preempts a lawsuit for a common law tort, intentional infliction of emotional distress, caused on the job by a fellow employee. According to NCUA, appellant was obliged to take her claim to DOES, the agency charged with administering workers' compensation claims.

 We agree that, in cases not premised on allegations of sexual harassment, the decisional law holds that the trial court ordinarily will not have jurisdiction over an emotional distress claim based on the acts of a supervisor or co-worker since there typically will be a "substantial question" whether the WCA applies. *See Grillo*, 540 A.2d at 748–50; *Harrington*, 407 A.2d at 661; *cf. District of Columbia v. Thompson*, 570 A.2d 277, 285–87 (D.C.1990) (*Thompson I*), *aff'd in part and vacated in part*, 593 A.2d 621, 635–36 (D.C. 1991) (*Thompson II*), *cert. denied*, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991) (applying public employment law "conceptually close to the WCA" in case of alleged intentional infliction of emotional distress).

Case law governing the public sector is informative here. In Part II of *Thompson I* we held that, under the disability provisions of the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–624.2 to –624.46 (1992 Repl.), see *supra* note 14, the employee initially must submit a claim of intentional infliction of emotional distress, allegedly caused by her supervisor, to DOES, the agency charged with administering CMPA's disability provisions, when there is a "substantial question" whether the claim "fall[s] within CMPA." *Thompson I*, 570 A.2d at 285.[15] Essentially, therefore, in a case of alleged intentional infliction of emotional distress on a public employment job, we incorporated *Grillo's* and *Harrington's* WCA analysis into CMPA—but only after distinguishing earlier case law.

This court previously had held in *Newman v. District of Columbia*, 518 A.2d 698, 705–06 (D.C.1986), another CMPA case alleging intentional infliction of emotional distress, "that allegations of 'humiliation,' 'embarrassment,' 'public ridicule,' and 'personal indignity' did not amount to an 'injury' within

---

15. In *Thompson II*, 593 A.2d at 635, we "reaffirmed ... Part II (CMPA disability provisions)."

CMPA and that, because the appellant in *Newman* did not claim he was disabled by his injuries, CMPA was inapplicable." *Thompson I*, 570 A.2d at 286.[16] In *Thompson I*, however, the employee not only had alleged humiliation and mental suffering in the complaint but also had effectively amended the complaint in her pretrial statement to allege "permanent and serious psychological injuries." 570 A.2d at 286. According to the court, this latter allegation suggested a "disability," which is defined—in the words of the analogous WCA—"as 'physical or mental incapacity because of injury which results in the loss of wages.'" *Id.* (quoting D.C.Code § 36–301(8) (1988)). We therefore recognized, for CMPA's exclusivity purposes, a distinction (drawn from *Newman* and traceable to *Mason*, see *supra* note 16) between "mental suffering" that results in disability and "mental suffering" that does not. We concluded the former, but not the latter, falls within CMPA:

> While the WCA and accompanying case law are not directly applicable, and while Thompson did not specifically allege that she was 'disabled' because of her injuries, the conceptual closeness of WCA to [the disability provisions of] CMPA, coupled with the expansion of Thompson's claim [in her pretrial statement], as evidenced by the proffered testimony of her experts, effectively turned the claim of mental injuries into one of mental disability at least arguably within the scope of CMPA.

*Id.* Consequently, we held in *Thompson I*, after equating "disability" under CMPA with "disability" under the WCA, that DOES had primary jurisdiction because there was a "substantial question" whether Thompson had, or had not, "suffered a mental disability" *id.*, from her emotional distress.

In the present, private employee case, appellant alleges disabling injuries from the emotional distress she has suffered from West's actions. In *Thompson I* we noted this court has "held that injuries caused intentionally by strangers or by co-workers are compensable and thus require employees to submit claims for workers' compensation benefits before filing suit." *Id.* at 287 (citing *Grillo* and *Harrington*). Accordingly, unless there is some special reason why the *Harrington–Grillo* line of WCA cases—buttressed by *Thompson I* reasoning as applied to emotional distress claims—does not resolve the issue, the "substantial question" whether appellant's emotional distress has resulted in disability compensable under the WCA means that DOES (the agency administering workers compensation), not the Superior Court, has primary jurisdiction.

**B.**

■■■■■ But there *is* a special reason why *Harrington* and *Grillo* do not necessarily control. The fact that appellant's emotional distress claim is based on the same events that generated her sexual harassment claim under the Human Rights Act substantially affects the analysis. In resolving the jurisdictional issues, we rely on allegations and characterizations in the complaint, not on the trial record.[17]

The *Thompson–Newman–Mason* line of CMPA cases incorporated the WCA definition of "disability" to draw the line between emotional distress claims that are, and those that are not, preempted by CMPA (sexual harassment was not an issue). We concluded that disabling injuries from emotional dis-

**16.** *See also Mason v. District of Columbia,* 395 A.2d 399, 402–03 (D.C.1978) (construing federal law identical to CMPA as applied to action for assault and battery, false arrest, and false imprisonment and holding that alleged "mental suffering" caused by underlying acts "was not an 'injury' within the meaning of the Act").

**17.** Jurisdiction "is primarily a threshold matter, determined when the parties file their pleadings and pre-trial motions." *King,* 640 A.2d at 661. Consequently, the jury's verdict against appellant on her sexual harassment claim is irrelevant to the question whether the trial court had jurisdic-
tion over appellant's emotional distress claim. If the court had jurisdiction over appellant's claims for sexual harassment and for intentional infliction of emotional distress when the pleadings were filed and throughout the trial, the jury's verdict against appellant on her sexual harassment claim could not have divested the court of jurisdiction. *See, e.g., Berke v. Resolution Trust Corp.* 483 N.W.2d 712, 715 (Minn.App.1992) ("jurisdiction is determined at the time the suit is filed and *after vesting, cannot be ousted by subsequent events* ") (emphasis added).

tress are cognizable in the first instance by DOES, not by the trial court. *See Thompson I,* 570 A.2d at 286. But this conclusion, of course, had to mean that DOES had jurisdiction over injuries that were disabling *as defined under CMPA/WCA. Thompson I* could not have meant, and thus did not mean, that DOES had primary jurisdiction over injuries which perhaps were disabling in fact but yet were outside the legal definition of disability under the WCA.

■ We believe it is clear that, when emotional distress allegedly attributable to sexual harassment (in contrast with some other cause) results in disabling injuries in fact, the language of the WCA itself easily demonstrates that these are not statutory "injuries," and thus are not compensable disabilities, under the WCA. Accordingly, as elaborated below, the statutory language does not present a "substantial question" whether disabling injuries from emotional distress caused by sexual harassment are covered by the WCA; such injuries *"clearly*

are not compensable under the statute." *Harrington,* 407 A.2d at 661.[18]

■ An "injury" compensable under the WCA is defined as

*accidental* injury or death *arising out of and in the course of employment,* and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an *injury caused by the wilful act of third persons directed against an employee because of his [or her] employment.*

D.C.Code § 36–301(12) (emphasis added). While conceding that her emotional distress from sexual harassment and related retaliation occurred "in the course of" her employment, appellant argues that this injury was not "accidental," did not "aris[e] out of" her employment, and was not inflicted on her by a third person "because of" her employment.[19]

18. We consider here only a case in which the actions and events allegedly reflecting common law intentional infliction of emotional distress (count two) are the same as those allegedly reflecting statutory sexual harassment (count one) in the same complaint. Thus, this is a case in which a jury reasonably could find that West's behavior toward appellant that formed the basis of her sexual harassment and emotional distress claims began with his sexual advances, and that this behavior infected their entire working relationship thereafter, culminating in appellant's job termination as a result of West's revenge for a failed sexual relationship.

We are not, therefore, presented with an emotional distress claim grounded only in part on sexual harassment; for example, a pattern of actionable emotional abuse by a supervisor over a period of months or years with no perceptible sexual content, followed by the supervisor's effort over succeeding months to reorient the relationship through sexual overtures and threats. In this example, the sexual harassment would be but a part—albeit a significant part—of the emotional distress claim. We leave for another day the question (1) whether the operative facts of the statutory sexual harassment and common law emotional distress claims must be essentially the same in order assuredly to justify exclusion of the latter from WCA coverage, or (2) whether the emotional distress claim can be broader than the sexual harassment claim and yet piggyback on the latter's exclusion from the WCA.

We also leave for future litigation the question of primary jurisdiction over an emotional distress claim against an employer based on sexual

harassment by one co-worker and simultaneous harassment of some other kind by another co-worker.

Finally, although our analysis addresses any claim of intentional infliction of emotional distress that results in disability attributable to sexual harassment, we do not formally consider whether the WCA can ever apply to a claim alleging disability from emotional distress based on sexual harassment when the claimant has not filed in court an accompanying Human Rights Act complaint for sexual harassment based on the same underlying facts.

19. Appellant's contention that her injuries were intentionally inflicted, not "accidental," is not well taken. Although we agree that appellant's injuries were not "accidental" as to West, we cannot say the same with respect to the Credit Union. *See Grillo,* 540 A.2d at 744 ("only injuries specifically intended by the employer to be inflicted upon a particular employee ... fall outside the exclusivity provisions of the WCA and ... evidence presented to show the employer's knowledge with substantial certainty that an injury will result from an act does not equate with the specific intent to injure or kill when the injury is caused by the intentional act of a third person."). Appellant testified that Directors of the Credit Union were aware of West's behavior toward her, but appellant did not show that the Board itself "specifically intended" her injuries. Consequently, West's intentional acts were "accidental" from the viewpoint of the Credit Union. *See id.* at 748 (an injury imposed by wilful acts of co-employee or third party is "accidental" from perspective of employer).

In *Fazio v. Cardillo,* 71 App.D.C. 264, 109 F.2d 835 (1940), the United States Court of Appeals for the District of Columbia Circuit interpreted the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. §§ 901 *et seq.* (1984)—which is the WCA's statutory predecessor—and concluded:

> an injury *arises out of* the employment when it occurs [1] in the course of the employment and [2] *as the result of a risk involved in or incidental to the employment* or to the conditions under which it is required to be performed.... [T]he fact that the injury is contemporaneous or coincident with employment is not alone a sufficient basis for an award.

*Id.* at 265, 109 F.2d at 836 (emphasis added).[20] We conclude as a matter of law that sexual harassment is not "a risk involved in or incidental to" employment. We do so not merely because a statute—the Human Rights Act—forbids such harassment during day-to-day workplace interaction but, more fundamentally, because sexual harassment is altogether unrelated to any work task. Sexual harassment is facilitated on the job only through the happenstance of two persons' physical proximity at the same place of employment; it has nothing whatsoever to do with, and cannot be justified by reference to, any task an employee is called upon to perform, even if the persons involved work together and have a supervisor-supervisee relationship.[21] We therefore agree with appellant that her injuries resulting from emotional distress attributable to sexual harassment were not statutory "injuries" "arising out of" her employment.

The analysis is not complete, however, because the WCA definition of "accidental injury" also encompasses all injuries "caused by the wilful act of third persons directed against an employee because of his [or her] employment." D.C.Code § 36–101(12). Although the incidents underlying appellant's emotional distress claim may have been "wilful" acts by West (a "third person[ ]"), as a matter of law they were not directed against appellant "because of her employment" since sexual harassment, as already indicated, is not within the risk attributable to an employment relationship as such.[22]

Appellant's alternative arguments that she had alleged intentional acts by the Credit Union as an entity and that West was the alter-ego whose intentional acts should be attributed to the Credit Union are unavailing. At trial, especially in agreeing to the jury instructions, appellant based the Credit Union's liability exclusively on a theory of *respondeat superior,* not on allegations of the Credit Union's independent liability.

**20.** *See also Baggett Transp. Co. of Birmingham v. Dillon,* 219 Va. 633, 248 S.E.2d 819, 822 (1978) ("An injury arises out of employment when there is ... a causal connection between the conditions under which work is required to be performed and the resulting injury. Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment.")

**21.** *See King v. Consolidated Freightways Corp.,* 763 F.Supp. 1014, 1017 (W.D.Ark.1991) ("claims of sexual harassment fall outside the purpose and intent of the workers' compensation law [because] sexual harassment ... cannot be recognized as a risk inherent in any work environment."); *Harrison v. Edison Bros. Apparel Stores,* 724 F.Supp. 1185, 1191 (M.D.N.C.1989) (alleged *injuries* of "severe mental and emotional distress" resulting from sexual harassment are not a "natural risk" of employment and are not covered by the exclusivity provisions of the North Carolina WCA), *aff'd in part, rev'd in part on other grounds,* 924 F.2d 530 (4th Cir.1991); *Byrd v. Richardson–Greenshields Sec., Inc.,* 552 So.2d 1099, 1104 n. 7 (Fla.1989) (concluding that "as a matter of public policy, sexual harassment should not and cannot be recognized as a 'risk' inherent in any work environment."); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 340 S.E.2d 116, 124 (1986) ("Sexual harassment is not a risk to which an employee is exposed because of the nature of the employment ... [and, thus, the] emotional injury suffered by [appellant], resulting from [co-employee's] sexual harassment, is not ... a 'natural and probable consequence or incident of employment.' ").

**22.** *See Fazio,* 71 App.D.C. at 265, 109 F.2d at 836 (injuries sustained by employee in "personal quarrel [with another employee] not traceable to the duties of the employment" not covered by LHWCA); *Garvey v. Dickinson College,* 761 F.Supp. 1175, 1191–92 (M.D.Pa.1990) (claim of sexual harassment not precluded by WCA since alleged distress arose from harassment that was personal in nature); *Schweitzer v. Rockwell Int'l,* 402 Pa.Super. 34, 586 A.2d 383, 391 (1990) (alleged emotional distress resulting from sexual harassment by supervisor not compensable under Pennsylvania WCA since injury arose from harassment personal in nature, not part of em-

In sum, appellant's claim for intentional infliction of emotional distress, based on her allegations of sexual harassment, does not reflect an "injury" compensable under the WCA; it did not "arise out of" her employment and was not inflicted on her by a third person "because of" her employment. D.C.Code § 36–301(12).[23] We subscribe completely to the words of the Supreme Court of Florida:

> Our clear obligation is to construe both the workers' compensation statute and the enactments dealing with sexual harassment so that the policies of both are preserved to the greatest extent possible.
>
> \* \* \* \* \* \*
>
> [W]orkers' Compensation is directed essentially at compensating a worker for lost resources and earnings. This is a vastly different concern than is addressed by the sexual harassment laws. While work place injuries rob a person of resources, sexual harassment robs the person of dignity and self esteem.... To the extent these injuries are separable, we believe that they should be, and can be, enforced separately.
>
> \* \* \* \* \* \*
>
> *Similarly, to the extent that the claim alleges ... intentional infliction of emotional distress arising from sexual harassment ... the exclusivity rule will also not bar [it]. This is so because th[is] cause[ ] of action address[es] the very essence of the policies against sexual harassment— an injury to intangible personal rights.* Byrd, 552 So.2d at 1102–04 (emphasis added).

### C.

There is case law in this jurisdiction, drawn from public employment litigation, that reinforces the foregoing analysis. In *King v. Kidd*, we held that a public employee's common law tort claim for intentional infliction of emotional distress, which she had joined with a statutory claim for sexual harassment, could go forward in Superior Court against the hierarchy of supervisors who allegedly had harassed her, without preemption by an administrative remedy under CMPA. Specifically, we held that CMPA's personnel provisions did not preempt plaintiff's "tort claims of intentional infliction of emotional distress based on acts of sexual harassment and subsequent retaliation." *Id.*, 640 A.2d at 664. We sustained the court's "jurisdiction to hear both [plaintiff's] sexual harassment claim and her interrelated or 'pendent' tort claim," *id.* (citation and footnote omitted), because plaintiff's tort claim was "fundamentally linked to her sexual harassment claim," i.e., it "had an inherent 'nexus' to" that claim. *Id.*[24] We distin-

---

ployer-employee relationship); *Ward v. General Motors Corp.*, 431 A.2d 1277, 1280 (Del.Super.Ct.1981) (although employment placed plaintiff and co-employee, who sexually harassed and assaulted plaintiff, at location of injury, WCA did not cover plaintiff's injury because injury was directed against her for personal, not employment-related, reasons).

**23.** NCUA argues that if appellant's injury did not "arise out of" her employment and if West's behavior toward appellant was not directed toward her "because of" her employment, then the Credit Union could not be liable for West's acts under the theory of *respondeat superior*, the doctrine that imposes liability on employers for torts of their employees, committed within the scope of employment, that are foreseeable by the employer. *See Weinberg v. Johnson*, 518 A.2d 985, 990 (D.C.1986); *District of Columbia v. Coron*, 515 A.2d 435, 438 (D.C.1986). This argument is not well taken. WCA's requirements that, for compensability, the employee's injuries must either "arise out of" her employment or a third person's intentional acts must be directed toward the employee "because of" her employment fo-

cus on the employee's employment, whereas the *respondeat superior* doctrine looks toward the actor's—West's—employment. Therefore, even if appellant's injuries did not "arise out of" her employment and even if West's acts were not directed toward appellant "because of" her employment, West's actions still can be, and they were, within the scope of *his* employment in that he took out his frustration on appellant by criticizing her work from his position as Chairman of the Board. In other words, although West's motivation to inflict injury on appellant was personal, he used his employment—specifically his position as appellant's superior—to achieve his aim. West's actions, moreover, were not merely foreseeable by the Credit Union; its Board actually witnessed these actions.

**24.** In *King*, we analogized plaintiff's "common law claim accompanying her sex discrimination claim as 'pendent,' similar to a state law claim that might be pendent to a federal claim if 'derive[d] from a common nucleus of operative fact.' *United Mine Workers v. Gibbs*, 383 U.S. 715, 725[, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218]

guished the *Thompson* litigation, where we had "concluded that CMPA preempted Thompson's tort claim for intentional infliction of emotional distress because the [previously described] actions of her supervisor constituted personnel evaluation decisions and disciplinary actions" which—unlike sexual harassment—fit "squarely within the text and purpose of the CMPA's review and grievance procedures." *Id.* at 663 (citing *Thompson II*, 593 A.2d at 635).[25]

*King*—refining *Thompson I and II*—therefore stands for the proposition (among other things) that not all emotional distress claims by public employees attributable to actions by a supervisor or a co-worker are subject to the primary jurisdiction of DOES to decide whether an administrative remedy under CMPA applies. We reached our conclusion in *King*, akin to our analysis of the WCA in Part III.B., by noting that sexual harassment is not "an instance of typical 'employee-employer conflicts,'" *id.* at 677—i.e., not "an inherent part of the employment situation," *id.* at 678—that CMPA's personnel grievance machinery is authorized and designed to accommodate.

■ The question for us, however, is how *King*, a CMPA case, bears on the WCA.[26] We perceive no distinction between public and private employment that could warrant a

different result from *King* under the WCA, unless there are differences between CMPA and the WCA that would so require—the issue to which we now turn.

Because *King* answered the exclusivity question for CMPA's personnel provisions, NCUA argues that *King*'s rationale is inapplicable to CMPA's disability provisions and that it follows, *a fortiori,* that *King* does not affect the WCA. We recognized in *Thompson II* that CMPA's personnel provisions and its disability provisions "have altogether different subject matter and purposes" and, for that reason, "may be treated as separate statutes." *Id.,* 593 A.2d at 630. Thus, it is true that we cannot say a *King* analysis applicable to CMPA personnel provisions applies automatically to CMPA's—or to WCA's—disability provisions. On the other hand, as we have said, unless there is a meaningful statutory distinction between CMPA's disability and personnel provisions when sexual harassment is at the heart of a claim for emotional distress, *King* should apply equally to both; otherwise, different treatments under those respective provisions would make no sense.

We see nothing in the WCA itself that would foreclose applying *King's* result under that statute.[27] In the first place, if appellant's emotional distress had not led to disability, then of course there would be no

... (1966)." 640 A.2d at 665 In *Gibbs*, the Court characterized pendent claims as those which a plaintiff "would ordinarily be expected to try ... all in one proceeding." 383 U.S. at 726, 86 S.Ct. at 1139. The Court added that justification for the application of pendent jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants." *Id.*

**25.** In the *Thompson* litigation the plaintiff had alleged, for example, the following conduct by her supervisor:

Maury criticized her in memorandum after memorandum; he approved her leave and then changed her status to absence without leave; he refused to consider her for promotion to the next grade level or to give her the computer test she asked for; he isolated her from the other employees; he requested statements from her doctor as to her limited hours; he wrote memoranda on her excessive leave; and he assaulted her and lied about it, resulting in her job loss.

*Thompson I,* 570 A.2d at 290 (cited in *King,* 640 A.2d at 663; *Thompson II,* 593 A.2d at 625).

**26.** *King's* analysis was not available to the trial judge; that decision was issued 14 months after the judge issued his opinion on the motions for j.n.o.v. There is, moreover, a facial distinction: *King* dealt only with CMPA's exclusivity as applied to plaintiff's supervisors; *King* did not analyze employer liability—the only kind of liability that the WCA covers. But *King's* CMPA analysis would not have differed if the court had applied it to the District of Columbia as employer. The exclusivity principle applicable under CMPA to plaintiff's fellow employees presumably was premised, initially, on protecting the employer, and thus CMPA's extension of exclusivity from employer to co-worker suggests parity between the two situations. We perceive no basis for concluding, on any set of facts, that intentional injuries caused by a co-worker, if not covered by CMPA, could nonetheless leave the employer covered by CMPA.

**27.** Because CMPA is not before us, we do not formally resolve what happens under CMPA's disability provisions.

WCA barrier to a lawsuit. *See Thompson I,* 570 A.2d at 286; *Newman,* 518 A.2d at 705–06. It therefore would make sense to limit disability claims for emotional distress based on sexual harassment to the WCA remedy only if DOES has some special expertise in evaluating this particular kind of disability claim; otherwise, the irony would be palpable in limiting the most serious emotional distress claims (i.e., all disability claims) to WCA coverage while permitting all lesser emotional distress claims—eligible even for punitive damages—to go to court.

The fact is, of course, that DOES expertise in reviewing workers compensation claims typically pertains to evaluating the usual impairments that lead to total or partial, permanent or temporary, physical disabilities based on medical testimony; for example, back pain, loss of an arm, a collapsing knee. *See* D.C.Code § 36–308. To be sure, disabilities attributable to emotional causes theoretically come within DOES's purview, *see Thompson I,* 570 A.2d at 285–87, but this is the rare case from the usual work environment. When it comes to the consequences of emotional distress from sexual harassment, the Office of Human Rights—the agency charged with administrative responsibilities under the Human Rights Act, *see* D.C.Code § 1–2541—is arguably the greater expert. In any event, the point is, no justification is discernible for limiting disability claims for emotional distress to DOES processing when other like claims based on sexual harassment can proceed directly to court, and when DOES cannot offer special expertise making it a more suitable forum.

Furthermore, *King* recognizes that claim splitting between DOES and the Superior Court would create serious problems of judicial economy—inconvenience, added expense, and concerns about issue preclusion—unless an essentially "pendent" common law emotional distress claim is allowed to go forward in court with the corresponding statutory sexual harassment claim. See *supra* note 24.

In sum, *King* reinforces the statutory analysis that appellant's emotional distress claim is "clearly" outside WCA coverage.

**D.**

 There is another significant policy consideration here. Limitation of claims for emotional distress from sexual harassment to an administrative remedy under the WCA would frustrate implementation of the Human Rights Act.[28] That Act proscribes sex discrimination—including sexual harassment[29]—in the workplace. According to legislative history, enactment of the Human Rights Act underscored "the Council's intent that the elimination of discrimination within the District of Columbia should have the 'highest priority.'" REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS, July 5, 1977, at 3 (quoted in *Best,* 484 A.2d at 978) (Council Report). The statute provides an administrative remedy through the Office of Human Rights that can result in payment of compensatory damages, reasonable attorney fees, and hearing costs, *see* D.C.Code § 1–2553(a)(1). It also "provides a private cause of action for any individual claiming to be aggrieved by an unlawful discriminatory practice." *Best,* 484 A.2d at 978 (citing D.C.Code § 1–2556) (footnote omitted). Accordingly, a plaintiff may file suit in Superior Court seeking substantial damages—including punitive damages[30]—for sexual harassment in violation of the Act, without having to exhaust administrative remedies available through the Office of Human Rights. *See Best,* 484 A.2d at 978 n. 20 (citing *Williams v. District of Columbia,* 467 A.2d 140, 142 (D.C. 1983)).

We believe that confinement of emotional distress complaints to the WCA remedy, when premised on alleged disability from sexual harassment, would frustrate Human Rights Act policy not only by creating problems of judicial economy—especially concerns about issue preclusion—but also by forcing a litigant who seeks relief under the

---

**28.** D.C.Law 2–38 (effective December 13, 1977), 24 D.C.Reg. 6038, D.C.Code §§ 6–2201 *et seq.* (1978 Supp.), now codified at D.C.Code §§ 1–2501 *et seq.* (1992 Repl.).

**29.** *See* D.C.Code § 1–2512(a)(1) (1992 Repl); *Best,* 484 A.2d at 976–84, 986 & n. 33.

**30.** *See Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 370–73 (D.C.1993).

emotional distress label to settle for a remedy out of keeping with the kind of injury involved. Under the WCA there is a severe cap on allowable recovery. At best, "[c]ompensation for disability or death shall not exceed the average weekly wages of insured employees in the District of Columbia [computed annually] or $396.78, whatever is greater," D.C.Code § 36–305(b); *see id.* § 36–305(d). Generally, the WCA entitles a partially or totally disabled employee to a maximum recovery of 66⅔% of that employee's average weekly wage for a prescribed period. *See id.* § 36–308. Thus, WCA recovery is likely to be significantly less than tort recovery for damages attributable to disabling emotional distress based on sexual harassment. As the leading treatise writer has explained:

> A compensation system, unlike a tort recovery, does not pretend to restore to the claimant what he [or she] has lost; it gives him [or her] a sum which, added to his [or her] remaining earning ability, if any, will presumably enable him [or her] to exist without being a burden to others.

> \* \* \* \* \* \*

> Even among those who contend that the scale of benefits is generally too low, there are few if any who would contend that anything resembling tort principles of amount of recovery should be imported into compensation law. It was never intended that compensation payments should equal actual loss, if for no other reason than that such a scale would encourage malingering.

A. LARSON, THE LAW OF WORKMEN'S COMPENSATION, §§ 2.50, 2.59 (1994 Supp.).

One may try to argue that as long as an employee has a right to go directly to court alleging sexual harassment in violation of the Human Rights Act, it does not matter that a related emotional distress claim is confined to DOES processing and capped by WCA compensation limits. But of course it does matter. The chill on recovery of just compensation for acts of sexual harassment and related emotional distress is evident from the reasons elaborated above, since a complainant could not bring in the same forum all her claims based on the same facts rooted in sexual harassment.

### E.

We are satisfied that our analysis in Part III.B., based on statutory language and persuasive case law, see *supra* notes 21 and 22, demonstrates that there is no "substantial question" of WCA coverage here. We have gone beyond that analysis in Parts III.C. and III.D. to show that *King* buttresses our conclusion, and that considerations of judicial economy, agency expertise, and fair right of recovery all indicate that the WCA has no proper role in processing claims, however labeled, that essentially are based on sexual harassment.

We hold that appellant properly filed in court her common law claim alleging disability from emotional distress based on the same facts as those underlying her statutory claim for sexual harassment. She was not limited to a WCA remedy from DOES on her emotional distress claim.

## IV. *Sufficiency of the Evidence*

Both NCUA and West contend, as cross-appellants, that the evidence was insufficient to support Underwood's claim for intentional infliction of emotional distress, and that the trial judge accordingly erred in denying their motions for j.n.o.v. based on that ground.

### A.

■ Initially, Underwood replies that, by failing to move for a directed verdict at the close of all the evidence as required by Super.Ct.Civ.R. 50(b), the Credit Union and West waived the right to move for a j.n.o.v. after the jury returned its verdict. *See Gleason v. L. Frank Co.,* 328 A.2d 96, 98 (D.C. 1974) (defendant's failure to renew motion for directed verdict at close of all evidence precluded court from entertaining j.n.o.v. motion).

At the close of Underwood's case-in-chief, both the Credit Union and West moved for directed verdicts on two grounds: exclusivity of the WCA remedy and insufficiency of the evidence for a finding of intentional infliction of emotional distress. These motions were

denied. They subsequently renewed their motions at the close of their defense cases, at which point the following colloquy took place:

> [COUNSEL FOR CREDIT UNION]: I guess the first and foremost is if the Court had an opportunity to look at the seven cases [which deal with exclusivity of the WCA remedy], and if not, we can certainly defer that.
>
> THE COURT: You'll have to defer it, I had an opportunity to look at one.
>
> [COUNSEL FOR CREDIT UNION]: I'll be happy to defer it.
>
> THE COURT: And probably what I'll do is submit the issue to the jury and then *consider it in a motion for judgment notwithstanding verdict if the jury should rule that way.*
>
> [COUNSEL FOR WEST]: I'd like the record to reflect that I also continued my motion on behalf of defendant West.

(emphasis added). Thus, defense counsel each moved twice for directed verdicts, and the court indicated it would entertain j.n.o.v. motions (without conclusively indicating that they would be limited to the WCA issue). Underwood then presented two brief rebuttal witnesses. Defense counsel did not move again for directed verdicts or renew their previous motions, but, after the jury returned its verdict, both defense counsel moved for judgments n.o.v.

Although neither counsel explicitly mentioned sufficiency of the evidence during their colloquy with the trial judge after the defense had rested, the judge noted later—in ruling on Underwood's contention that he lacked power to consider the j.n.o.v. motions—that his conversation with counsel (quoted above) had satisfied the purposes of Rule 50(b), namely (1) preserving the sufficiency to the evidence as a question of law, and (2) calling attention to the opposing party to alleged deficiencies in the evidence at a point in the trial where that party could cure the defects by presentation of additional evidence. *See Howard Univ. v. Best,* 547 A.2d 144, 148 (D.C.1988) (*Best II* ). Specifically, the judge said:

> My conversation with counsel after presentation of the defense case makes plain that I was reserving judgment as to the suffi-

ciency of plaintiff's evidence and would entertain a motion for JNOV should the jury return a verdict for plaintiff. Thus, the first purpose of Rule 50(b)—to visit the JNOV issue without intruding on the jury's fact-finding province—has been satisfied.

The second purpose is to give the nonmoving party the opportunity to perfect its proof—to prevent the JNOV motion from being used as a trap sprung on the unwary. Here again my remarks alerted plaintiff that a motion for JNOV would be considered. There were no traps. Plaintiff presented all the evidence she had of Mr. West's ill-mannered behavior toward her. Nothing more would have been forthcoming had the motion for directed verdict been re-iterated after the few minutes of rebuttal testimony.

The trial judge therefore concluded—and we agree—that he properly could rule on the j.n.o.v. motions alleging insufficiency of the evidence. *See Ohio–Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 825 (7th Cir. 1978) (allowing j.n.o.v. motion when defendants-appellants moved for directed verdict at end of defense case, but failed to renew motion after rebuttal evidence, since purposes of Rule 50(b) had been met), *cert. denied,* 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *United States v. 353 Cases,* 247 F.2d 473, 477 (8th Cir.1957) (same); *see also Bayamon Thom McAn, Inc. v. Miranda,* 409 F.2d 968, 970–72 (1st Cir. 1969) (allowing j.n.o.v. motions when defendant-appellant moved for directed verdict at end of plaintiff's case, but failed to renew motion at close of all evidence, since court had indicated it would expect to receive j.n.o.v. motions); *see generally King,* 640 A.2d at 665 (although "appellants did not make a precise motion for directed verdict at the close of the evidence . . . [they] adequately preserved the issue of evidentiary sufficiency for appeal").

**B.**

We turn to the merits. NCUA and West argue, first, that the standard for intentional infliction of emotional distress requires a "higher" level of "atrocious and utterly intol-

erable" conduct than the standard satisfying a claim of sexual harassment, and thus that the jury verdicts in their favor on the easier-to-prove sexual harassment claim should preclude a verdict against them for the harder-to-prove intentional infliction of emotional distress. They argue, second, that the incidents which formed the basis of the emotional distress claim concerned professional disputes which, as a matter of law, do not constitute "extreme and outrageous" conduct and thus do not qualify for liability. Finally, West contends that Underwood failed to present sufficient evidence of damages, and that the trial court accordingly erred in refusing to grant him a j.n.o.v. for that reason.

■ "In reviewing the trial court's decision to submit [appellant's] intentional infliction of emotional distress claim to the jury, we must view the evidence in the light most favorable to [appellant], giving her 'the benefit of every rational inference therefrom.'" *King,* 640 A.2d at 667 (citing *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 38 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982)). To succeed with this intentional tort claim, however, appellant must show "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) cause[d appellant] 'severe emotional distress.'" *Howard Univ. v. Best,* 484 A.2d 958, 985 (D.C.1984) (*Best I* ) (citing *Sere,* 443 A.2d at 37). In this case, only the first criterion is at issue. Accordingly, the evidence will be sufficient to support a claim of intentional infliction of emotional distress, and thus the jury should decide the case, "if reasonable people could differ on whether the conduct is extreme and outrageous." *Id.* (citation omitted).

### (1).

■ NCUA's and West's contention that their favorable jury verdict in the sexual harassment claim effectively precludes a plaintiff's verdict on the emotional distress claim is flawed for two reasons. First, sufficiency of the evidence is evaluated from the

time the evidence is presented at trial; it is not affected by the jury's evaluation of the evidence in its verdict. *See id.* Accordingly, the jury verdict against Underwood on her sexual harassment claim cannot affect our sufficiency inquiry into the emotional distress claim.

Second, the standards for sexual harassment and for intentional infliction of emotional distress are different from one another; they are not legally related. Because they are comprised of different elements, the jury that fails to find one is not necessarily precluded from finding the other. *See, e.g., King,* 640 A.2d at 674–75.

More particularly, a prima facie case of sexual harassment is established "upon demonstrati[on] that unwelcome verbal and/or physical advances were directed at [complainant] in the work place, resulting in a hostile or abusive working environment." *Best I,* 484 A.2d at 980 (citation omitted). A jury, therefore, could find for the defendant by finding, for example, that the evidence came 95% of the way toward creating a hostile or abusive working environment. But the jury could then take that same evidence and find that it comprised "extreme and outrageous" conduct satisfying an emotional distress claim—as the jury apparently did here. One must bear in mind that the jury was instructed to give at most one recovery: if not for sexual harassment then for emotional distress, but not both. See *infra* Part V.B. The fact that the jury preferred to characterize its finding as "extreme and outrageous" conduct (resulting in compensable emotional distress) rather than as a "hostile or abusive working environment" (resulting from sexual harassment) does not mean the jury found no harassing sexual behavior at the heart of the matter.

### (2).

■ NCUA and West next contend that the evidence underlying Underwood's emotional distress claim was limited to evidence of professional misbehavior.[31] These acts,

---

31. They are referring to the following trial court findings:

Evidence at trial showed that, among other things: West yelled at [Underwood] for talking

to a member of the Board about an automobile repossession; yelled at her for "going behind his back" and talking with another member of the Board about the minutes of an August

they say, do not constitute the "extreme and outrageous" behavior necessary to support an emotional distress claim because they are mere "professional disagreements." *See Best I,* 484 A.2d at 986 ("employer-employee conflicts do not, as a matter of law, rise to the level of outrageous conduct").

The problem with this reasoning is evident from our earlier analysis: NCUA and West erroneously premise their argument on omission of all evidence of sexual harassment from the emotional distress calculation. As we have indicated, however, that evidence can do double duty but must be limited to one recovery: it can be used to satisfy the sexual harassment claim or to achieve the critical mass of evidence required for emotional distress recovery. On this record, the so-called evidence of West's professional misbehavior, see *supra* note 31, did not necessarily reflect only professional disagreements; the jury reasonably could have found that this behavior had been rooted in a campaign of revenge against appellant for rejecting West's further sexual advances.

We noted in *King,* that in determining whether the conduct complained of is "extreme and outrageous," the court must consider "the specific context in which the conduct took place." 640 A.2d at 668. We elaborated that "context" consists not only of "the nature of the activity at issue" but also of *"the relationship between the parties,* and the particular environment in which the conduct took place." *Id.* (emphasis added). The trial judge, therefore, did not err in concluding that the evidence of sexual harassment colored West's professional behavior toward Underwood; *i.e.,* that the jury could have found that West's professional behavior toward appellant was motivated by sexual revenge, causing a level of emotional distress not otherwise caused by the kinds of professional behavior cited. According to the trial court:

There are two salient factors which differentiate this case from the garden variety bickering or hostility that is commonplace in the workplace but not actionable: the first is the one time sexual relationship between the two; the second is Underwood's fragile emotional and physical state, and West's awareness of it.

The parties' previous relationship critically changes the impact and context of West's actions. Cruelty from an ex-lover is unlike hostility that has some other trigger. Because of the congeries of emotions involved the ex-lover's actions are far more likely to cause pain and mental turmoil. Additionally, the motivation for the acts bears on their unacceptability. To wreak revenge because a married woman won't submit sexually is far more odious and reprehensible than meanness traceable to, for example, professional competition or personal dislike. Likewise, harsh actions against the weak are far more unacceptable than those against the strong. During the time in question, Mary Underwood suffered numerous emotional and physical problems. West capitalized on those weaknesses, and the jury could have readily found that West acted abusively knowing the effect his abusive actions might have on Underwood.

While no single action of West's, if taken against a person of average physical and emotional stamina, would be considered outrageous, when the acts are considered together and in the context of Underwood's vulnerability and previous romantic history, the jury's verdict on Underwood's claim of intentional infliction of emotional distress is justified.

(Footnote omitted.) We agree entirely with the judge's analysis.

In sum, even though the jury found that the evidence presented did not amount to sexual harassment, it could well have found

meeting; threatened to do his own evaluation of her performance for the Board in which he would "get her"; threatened to tell lies about her because she refused to sleep with him; threatened to tell the Board that it would have to choose between the two of them if she complained about him; yelled at her in front of the Board for passing out documents at a

meeting; berated her in front of the Board about supposed deficiencies in the current Credit Union newsletter; and threw down a heavy box of documents at her feet, commanding her to carry it to the Credit Union even though he was aware that she was physically unable to do so.

West and the Credit Union liable for intentional infliction of emotional distress on all the evidence presented, *see King,* 640 A.2d at 674–75, since "reasonable people could differ [on] whether [West's actions were] extreme and outrageous." *Best I,* 484 A.2d at 985.

### (3).

Appellee West argues, as cross-appellant, that Underwood's evidence on damages was too speculative, and thus insufficient, to support a verdict, and that the trial judge accordingly erred in failing to grant his motion for j.n.o.v. Specifically, West contends that (1) appellant's evidence was insufficient to establish causation, because expert evidence was lacking to show that her disability had been caused by problems in the work place rather than by her pre-existing lung disease (sarcoidosis); (2) the evidence did not justify an award for lost wages because appellant did not present unambiguous testimony about how long she intended to work and about how long she could have worked given her pre-existing sarcoidosis; and (3) the evidence did not permit an award of damages for future pain and suffering because appellant's expert did not express an opinion about the prognosis for her depression.

 Notwithstanding the jury's broad discretion in awarding damages, its award must be supported by "substantial evidence." *Doe v. Binker,* 492 A.2d 857, 860 (D.C.1985). "While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages." *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982). In "medically complicated" cases involving "multiple and/or preexisting causes" or "questions as to the permanence of an injury," expert testimony is required to prove causation. *Baltimore v. B.F. Goodrich Co.,* 545 A.2d 1228, 1231 (D.C.1988). On the other hand, "[i]n the absence of 'complicated medical questions' the plaintiff's own testimony, without need for supporting expert medical testi-

mony, will suffice to prove causation of injury." *International Sec. Corp. of Virginia v. McQueen,* 497 A.2d 1076, 1080 (D.C.1985).

 We turn to West's first contention. In this case, the injuries for which appellant has claimed damages include emotional distress, depression, humiliation, stress, and an inability to cope with her sarcoidosis which led to an exacerbation of her pre-existing condition, all allegedly resulting from West's behavior toward her. At trial, appellant presented the testimony of her psychiatrist, Dr. Legler, who testified that appellant's harassment at work had resulted in depression, and that this depression had led to an inability to cope with her pre-existing sarcoidosis, as evidenced by increased breathlessness and bronchial spasms.[32]

Appellant also called to the stand her treating physician, Dr. Tauber, a specialist in pulmonary medicine, who testified that appellant had become permanently disabled. More specifically, he testified that, although pulmonary function and radiological test findings may indicate that someone is physically disabled by sarcoidosis, a person's positive perception of her condition can prevent her from succumbing to disability; that appellant's pulmonary functions had not changed materially since 1982; and thus that appellant's permanent disability was attributable to the changed "perception of her condition," which Dr. Tauber said could be attributed to depression. The jury could reasonably understand this testimony to say that ordinarily someone with Underwood's lung condition would be disabled, but that a positive emotional outlook could compensate in a way that allowed her to work comfortably enough, despite physical disease symptoms. An onset of depression, however, could undermine the positive mental attitude necessary to cope with the sarcoidosis, with the result that the disease takes over to the point of certifiable disability.

---

**32.** West contends the trial court erred in permitting Dr. Legler to testify about causation because he was not an expert in sarcoidosis. Dr. Legler, a qualified psychiatrist, was called to testify about the source of appellant's depression and the effect of this depression on her ability to cope with her disease—topics on which he was qualified to testify. Dr. Legler was not asked to testify as to whether the actual symptoms of appellant's sarcoidosis were affected by her stress, except on cross-examination by the defense, at which time he replied in the negative.

Appellant herself testified that she had undergone treatment for stress attributable to the hostile work environment created by West's behavior; that she had been unable to cope with the demands of everyday life and had scarcely left her apartment for a year after termination of her employment; and that she had been hospitalized for severe depression after that job termination.

The foregoing evidence, taken together—which included all necessary expert testimony—was sufficient for the jury to find that appellant suffered from depression and a resulting inability to cope with her sarcoidosis, which led to permanent disability, a consequence of problems at work attributable to her treatment by West.[33]

■ Appellant's claim for damages was based both on lost wages and on pain and suffering. West's second contention challenges the sufficiency of the evidence to justify awards for lost future wages and for future pain and suffering. We note again that, when dealing with a challenge to evidentiary sufficiency, we must view the evidence in the light most favorable to appellant. *See Sere*, 443 A.2d at 38.

As to lost future wages, appellant testified that she had intended to work until she was fifty-five. (She was thirty-seven at time of trial.) There was other evidence that appellant had been committed to her work. Dr. Legler testified that she had been "devoted" to it, and the President of the Credit Union, Adenia Taylor, testified work had been "primary" in appellant's life. No trial testimony established that appellant actually could have worked until age 55. Moreover, West contends that this assertion was effectively nullified by Dr. Tauber's testimony on cross-examination that he would have helped appellant file for disability between March 1985 and January 1987, a period before the incidents at issue occurred. Dr. Tauber's actual testimony, however, effectively refuted that contention. He testified that although appellant's "disease had been significant for a long period of time," and thus could have justified a disability claim, appellant's attitude had

made a difference. Thus, he had not "broached the topic of disability with [appellant] because [he] felt that if she wasn't complaining about her ability to work [ ] there was no reason for [him] to stop her from working because of the fact [that] she was not in a job which was causing any deterioration of lung function." As indicated earlier, however, Dr. Tauber also testified that appellant's changed perception of her sarcoidosis—of a medical condition that was disabling but for a positive attitude—resulted in her disability, finally, in March 1988. We are satisfied, therefore, that this testimony was sufficient to establish—if not that appellant could have worked until age 55—that her work life had been significantly cut short because of West's actions, and thus that she was entitled to compensation for lost future wages.

■ West also contends, finally, that because appellant did not present expert testimony on the prognosis of her depression, she is not entitled to damages for future pain and suffering. Dr. Tauber, however, had certified appellant as permanently disabled. In addition, appellant had been under psychiatric care for depression for four years immediately preceding the trial and her condition had not improved significantly in the preceding one and a half years. In *McQueen*, 497 A.2d at 1081, we opined that, " 'when the bad effects of an injury have continued for years, laymen may reasonably infer permanence' even in the absence of expert medical testimony, if there is no contrary testimony that the injuries are temporary." *Id.* (quoting *American Marietta Co. v. Griffin*, 203 A.2d 710, 712 (D.C.1964)). Because there was no testimony that appellant's condition was temporary, we are satisfied that she proved entitlement to damages for future pain and suffering.

\* \* \*

In sum, we conclude that the evidence was sufficient to support appellant's intentional infliction of emotional distress claim, and that

---

**33.** Because appellant claimed aggravation of her pre-existing sarcoidosis condition as part of her injury, it was unnecessary for her to prove that her injury was not caused by her pre-existing condition.

it further sufficed to support an award of damages.

## V. *Inconsistent Verdicts*

### A.

NCUA stresses, as cross-appellant, that in the event the WCA does not bar this lawsuit, NCUA's liability—based solely on the doctrine of *respondeat superior*—is premised on the liability of West, the only active tortfeasor. NCUA therefore contends that the verdicts against the Credit Union and West are inconsistent, and accordingly that NCUA's liability should be limited to the $10,000 the jury awarded against West, rather than governed by the $425,000 the jury awarded against the Credit Union. West also notes that the verdicts are inconsistent. His concern on appeal, at this point, is to be sure his liability is limited to $10,000, without exposure to the larger sum awarded against the Credit Union.

Our conclusion in Part IV. that the evidence was sufficient to support appellant's claim, including damages, for intentional infliction of emotional distress does not necessarily mean reinstatement of the $425,000 jury verdict against the Credit Union. In his order granting the motion for j.n.o.v., the trial judge noted that this verdict was inconsistent with the jury's $10,000 verdict against West, because—as NCUA contends on appeal—the Credit Union's liability was based on the doctrine of *respondeat superior* and, as such, could not be more than the liability charged against the active tortfeasor. The judge added that if he had not granted NCUA a j.n.o.v. based on the exclusivity of the WCA, a new trial (rather than a $10,000 damage award against the Credit Union) would be warranted on the issue of damages.

Appellant argues that we should not reach the inconsistent verdict issue. She contends that the Credit Union's failure to object to the verdict before the jury was discharged resulted in a waiver of its rights to challenge the verdict later, and thus that the $425,000 verdict against the Credit Union should be reinstated.

### B.

The court submitted to the jury separate, identical general verdict forms for West and for the Credit Union. On each the jury was to vote "yes" or "no" on the sexual harassment count (with an amount of damages supplied if the answer was "yes"). If the jury answered "no" on sexual harassment, it was to go on to the emotional distress claim and, if it answered "yes" on that claim, it was to award damages against the particular defendant. Finally, the jury could consider punitive damages if it awarded compensatory damages against a defendant.[34]

The trial court instructed the jury that "[e]ach defendant is entitled to a separate verdict with respect to each and every claim that the plaintiff has made in this case." The court made clear, however, after instructing about the respective elements of sexual harassment and of intentional infliction of emotional distress, that the Credit Union's liability was dependant on a finding that West was liable (and on meeting the other requirements of *respondeat superior* liability). The court summarized: "So basically with respect to both defendants, with respect to both claims, the plaintiff Ms. Underwood has the burden of showing that her damages were caused in substantial part by the actions of Mr. West."

In short, the jury was told that the Credit Union's liability, if any, would have to be derivative; there was no independent basis for it. The judge did not go further, however, to make clear that any damages assessable against the Credit Union, just like the liability itself, would be dependent on—and thus could not exceed—any damages the jury awarded against West. That idea may have been implied for a sophisticated listener to understand; it was not expressly stated. Nor did the Credit Union object to this omission by asking the judge to tie any damages payable by the Credit Union to the amount assessed against West.

We agree with the trial judge that, under the doctrine of *respondeat superior,* the Credit Union's liability was based exclusively upon West's actions. *See, e.g., City of*

---

**34.** The jury voted "no" as to each defendant with regard to punitive damages.

*Hialeah v. Hutchins,* 166 So.2d 607, 609 (Fla. 1964) ("a judgment against an active tortfeasor establishes the full limit of liability against other persons who are only derivatively liable under the doctrine of respondeat superior for the active tortfeasor's wrong"); *Goines v. Pennsylvania R.R.,* 6 A.D.2d 531, 179 N.Y.S.2d 960, 962 (1958) ("the liability of the railroad was derivative and, in consequence, it could not be liable for a larger sum than was assessed as the damages against the individual defendants who were the primary tortfeasors."); *Ferne v. Chadderton,* 363 Pa. 191, 69 A.2d 104, 107 (1949) (jury verdict of greater sum against employer, liable only under doctrine of *respondeat superior,* than against employee, the active tortfeasor, was "legally indefensible"). Thus, the jury verdicts were unquestionably inconsistent. As the trial judge pointed out, the Credit Union's jury-assessed damages ($425,-000), based solely on West's actions, were more than 42 times greater than West's ($10,000).[35]

Although not directly on point here, it is interesting to note, for perspective, that Super.Ct.Civ.R. 49, which addresses "special verdicts" and "general verdict[s] accompanied by answer[s] to interrogatories," announces a principle that is quite relevant. As to a special verdict, Rule 49(a) says that if the court, in submitting written questions of fact to the jury,

omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to a general verdict accompanied by answers to interrogatories, Rule 49(b) provides:

When the answers are consistent with each other but 1 or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers notwithstanding the general verdict, or the Court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and 1 or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the Court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

In this case the jury was asked to render general verdicts without answers to interrogatories; therefore, Rule 49 does not apply. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 113 & n. 5 (D.C.1982). But the obvious inconsistency in this case, based on limited, derivative liability, was just as great—and should have been just as obvious to the Credit Union attorneys—as in any Rule 49 situation. That rule, particularly section (b), countenances a waiver of objections to inconsistencies in the verdict that are not pointed out before the jury is discharged.[36]

---

**35.** Appellant argues that she presented sufficient testimony for the jury to find the Credit Union independently—not derivatively—liable, and that the verdicts against the Credit Union and West, therefore, were not necessarily inconsistent. We cannot agree. The trial proceeded solely on a theory of *respondeat superior,* without consideration, in the alternative, of the Credit Union's independent liability. That argument, therefore, is not available on appeal.

**36.** Super.Ct.Civ.R. 49 is identical to Fed.R.Civ.P. 49. *See Cobb,* 453 A.2d at 112–13 & n. 4. Case law interpreting the federal rule, therefore, applies to our local rule. *See Tupling v. Britton,* 411 A.2d 349, 351 (D.C.1980). As to Rule 49(a), the federal circuit courts of appeals are split on whether failure to object before discharge of the jury waives objection to an inconsistent verdict. *Compare Pierce v. Southern Pac. Transp. Co.,* 823 F.2d 1366, 1370 (9th Cir.1987) (rule that objections to inconsistent jury verdict must be made before jury is discharged does not apply to spe-

cial verdicts) with *Masure v. Donnelly,* 962 F.2d 128, 134 (1st Cir.1992) (finding waiver of right to contest inconsistencies in special verdict when objecting party failed to point out inconsistencies before jury was discharged); *see also Bates v. Jean,* 745 F.2d 1146, 1150 (7th Cir.1984) (noting split in federal circuits over whether failure to object to inconsistency in special verdict before jury discharge results in waiver); *see generally* 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §§ 2510, 2513 (1994); Donald Olander, *Resolving Inconsistencies in Federal Special Verdicts,* 53 Fordham L.Rev. 1089, 1100–02 (1985).

In contrast, most courts deciding cases under Rule 49(b) have held that failure to raise the issue of verdict inconsistency before discharge of the jury results in waiver. *See Williams v. KETV Television, Inc.,* 26 F.3d 1439, 1443 (8th Cir. 1994) (a party waives any objection to an inconsistent verdict under Fed.R.Civ.P. 49(b) if she fails to object before jury is discharged); *Lockard*

Rule 49(b), therefore, evidences an important principle of judicial economy: there is good reason, in case of inconsistent verdicts, to require any affected party to point out the problem to the court right away, and to ask for the jury to correct it before the jury is discharged; otherwise, the affected party risks waiver of the inconsistency argument unless the trial court, for some other sound reason, decides to order a new trial.

## C.

We cannot ignore the fact that almost immediately after the jury was discharged, the Credit Union attorneys moved for a j.n.o.v. based on claimed exclusivity of the WCA remedy and, in the alternative, for reduction of its damages to the $10,000 awarded against West, or for a new trial, based on the inconsistent verdicts. In response to this alternative argument, plaintiff's counsel argued waiver based on the Credit Union's failure to ask for the jury to cure the inconsistency before the jurors were discharged. In granting the j.n.o.v., the trial judge ruled that the WCA provided an exclusive remedy, but he ruled in the alternative that the Credit Union would be entitled to a new trial (rather than to reduced damages limited to West's $10,000).[37]

In rejecting Underwood's waiver argument, the trial judge cited cases that premised the granting of a new trial on the court's denial of an objection lodged against the inconsistent verdicts before the jury was discharged. He noted that these commonly have concerned a problem with the "form," rather than the "substance," of the verdict. *See, e.g., Robbins v. Graham,* 404 So.2d 769,

770–71 (Fla.App.1981) (failure to object to jury's irregular notations on verdict form, which had been recognized at time jury was still present, "resulted in a waiver" of new trial since substance of verdict was "clearly ascertainable"); *Knisely v. Gasser,* 198 Ga. App. 795, 403 S.E.2d 85, 86–87 (1991) (claim to new trial based on inconsistencies in jury's award of medical expenses, but nothing for pain and suffering and for loss of consortium, waived because plaintiff's counsel had specified that jury verdict on special verdict form was "fine as to form"). The judge then observed that, in contrast, when the error was in the "substance" of the verdict itself, many courts have held that a failure to object to inconsistent verdicts before the jury was discharged did not result in waiver. *See, e.g., Sneed v. Cheetah Boat Co.,* 585 So.2d 809, 810 n. 1 (Ala.1991) (when "inconsistent verdict" objection "goes to the substance rather than the form of the verdicts," there is "no prohibition against raising [it] for the first time on a motion for a new trial"); *Shank v. Fassoulas,* 304 So.2d 469, 471 (Fla.App.1974) (failure to make timely objection may waive appellate review but will not prevent trial judge from exercising discretion to grant new trial); *George v. Standard Slag Co.,* 431 S.W.2d 711, 714 (Ky.1968) (because there was no evidentiary basis for jury's award of equal amounts to all claimants, failure to object before jury was discharged was not fatal, and case was remanded for new trial).

In his written opinion, the trial judge followed this case law distinction reflecting (in his words) the following rule: "when it is not merely the form of the verdict that is at issue and when substantial injustice may be done, ... an objection is not waived by failure to

---

*v. Missouri Pac. R.R.,* 894 F.2d 299, 304 (8th Cir.) (same), *cert. denied,* 498 U.S. 847, 111 S.Ct. 134, 112 L.Ed.2d 102 (1990); *White v. Celotex Corp.,* 878 F.2d 144, 146 (4th Cir.) (same), *cert. denied,* 493 U.S. 964, 110 S.Ct. 406, 107 L.Ed.2d 372 (1989); *U.S. Football League v. National Football League,* 842 F.2d 1335, 1367 (2nd Cir. 1988) (same); *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.,* 791 F.2d 1416, 1423 (10th Cir.) (trial court erred in granting new trial because party's failure to object to inconsistency in jury verdict under Fed.R.Civ.P. 49(b) before discharge of jury constituted waiver), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

**37.** The judge elaborated:

> In the case at hand it is unclear just what the jury was attempting to do. It plainly was not attempting to apportion damages due to an assessment of proportionate culpability—West being far more culpable than the Credit Union. Yet is difficult to tell whether the jury would have awarded $425,000 against the Credit Union (a seeming "deep pocket") if it knew that it would be required to levy the same damages against West. None of the cases in which the court combined the verdicts or allowed the plaintiff to choose the larger one involved anything near the 42 to 1 disparity here.

raise it while the jury is still present." In addressing the merits of this proposition, we note there also is authority to support the view that failure to object to "inconsistent verdicts"—whether the defect is in form or in substance—results in waiver. *See, e.g., Adams v. United States Steel Corp.,* 24 Mass. App. 102, 506 N.E.2d 893, 895 (1987) (failure to object to "either the form of the special questions or to the jury verdicts" before jury discharge, especially when "inconsistency is patent on verdict slip," resulted in waiver); *Ivy v. Wal–Mart Stores, Inc.,* 777 S.W.2d 682, 683 (Mo.App.1989) (failure to raise issue of inconsistent verdict before jury was discharged, where jury ruled in plaintiff's favor for false arrest but did not award damages, resulted in waiver).

Finally, at least one court has issued a hybrid ruling. *See Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078, 1083 (Utah 1985) (party may not move for new trial on basis of defective verdict when it failed to object to ambiguity in verdict before discharge of jury; however, rule does not apply when "verdict is so ambiguous, contradictory or illogical that it does not clearly indicate for whom the verdict is rendered and the verdict would leave the Court in the

position of having no alternative but to guess at what the jury intended").

In the absence of a Superior Court rule governing what to do when there are inconsistent general verdicts unaccompanied by interrogatories,[38] we conclude that considerations of judicial economy[39] and fair play[40] cut strongly in favor of finding a waiver here.

In the first place, the Credit Union did not ask the judge, in giving jury instructions, to make clear that, just as the Credit Union's liability was dependent on a finding of West's liability, the damages awardable against the Credit Union could not exceed the damages assessed against West.

Second, although counsel for the Credit Union clearly knew or should have known the verdicts had to be consistent, counsel permitted discharge of the jury when the inconsistency was patently obvious: damages 42 times higher against the Credit Union than against West. Counsel declined to call the problem to the judge's attention so that the jury could do its job correctly. By moving immediately after the jury was discharged for a j.n.o.v. (on WCA grounds) and, in the alternative, for a reduced verdict of $10,000 or for a new trial, counsel could well have been hoping that if they lost on the WCA issue, the court would limit the Credit

---

**38.** *See generally Merchant v. Ruhle,* 740 F.2d 86, 89 (1st Cir.1984) (noting there is no federal procedural rule governing inconsistencies between two general verdicts). We note that similarly there is no procedural rule governing inconsistencies between general verdicts in the District.

**39.** *See Adams v. U.S. Steel Corp.,* 24 Mass.App. 102, 506 N.E.2d 893, 895 (1987) ("the complaining party must object prior to the discharge of the jury, in order that the judge may have the opportunity to resolve the problem without incurring the expense of time and money inherent in conducting a second jury trial."); *Bennion v. LeGrand Johnson Const. Co.,* 701 P.2d 1078, 1083 (Utah 1985) ("The rule requiring an objection if there is some ambiguity serves the objective of avoiding the expense and additional time for a new trial by having the jury which had heard the facts clarify the ambiguity if it is able to do so."); *see also White,* 878 F.2d at 146 (the purpose served by a rule of waiver under Fed. R.Civ.P. 49(b) is "to promote the efficiency of trials by allowing the original deliberating body to reconcile inconsistencies without the need for another presentation of the evidence to a new body."); *See generally* Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable*

*Federal Civil Jury Verdicts,* 28 Creighton L.Rev. 683, 706 (1995) ("Without the statutory mandate of Rule 49, federal courts have been forced to develop a common law response to inconsistent verdicts that involve general verdicts or multiple parties."); D. Olander, 53 Fordham L.Rev. at 1100–01 (advocating a strict waiver rule to promote efficiency).

**40.** *See McIsaac v. Didriksen Fishing Corp.,* 809 F.2d 129, 134 (1st Cir.1987) ("To decide otherwise would countenance agreeable acquiescence to perceivable error as a weapon of appellate advocacy.") (citation and internal quotation marks omitted); *Robbins v. Graham,* 404 So.2d 769, 771 (Fla.1981) ("Relitigation would deprive the appellants of their earned verdict and give the appellees an unearned additional bite at the apple."); *see also White,* 878 F.2d at 146 (abandonment of the waiver rule under Fed.R.Civ.P. 49(b) would "open[ ] the door to [ ] possible misuse ... by parties anxious to circumvent an unsatisfactory jury verdict by procuring a new trial.") (citation and internal quotation marks omitted); *see generally* S.P. Martin, 28 Creighton L.Rev. at 728 ("courts have applied waiver principles in order to avoid potential gamesmanship by the litigants").

Union's damages to the $10,000 awarded against West or, at worst, would order a new trial on damages before a jury that would not find Underwood entitled to a large verdict.[41]

Clearly, given the disparity between the two damage awards here, renewed deliberations by the same jury under proper instructions presented a substantial risk that the jury would confirm its $425,000 against the Credit Union by upping the damages awarded against West—a risk counsel apparently decided was not worth taking in light of other possible, less burdensome alternatives.

The likelihood of this kind of tactical thinking, when combined with considerations of judicial economy—preventing an unnecessary second trial—convinces us that cross-appellant NCUA is not entitled to a new trial on damages, let alone to a reduction of the verdict to $10,000.

We recognize from the cases cited by the trial judge that when a party has failed to object to inconsistent verdicts before the jury was discharged, some courts have decided whether to grant a new trial motion by refer-

ence to whether the inconsistency was one of "substance" (grant) or "form" (deny). We have read those cases and discern no clear meaning to that distinction, let alone a principled basis for it. Courts simply repeat and rely on the distinction without explaining why it makes sense. We conclude it does not make sense. We are persuaded by the case law that refuses to reward litigation tactics that knowingly avoid asking the jury that heard the case to cure the inconsistency, rather than asking for a second, expensive trial.

There may be cases where an inconsistency is less glaring than in this case—i.e., it may be discernible only on reflection, not necessarily in time to hold the party seeking a new trial accountable for failure to call it to the judge's attention before the jury is discharged. Such a case might well be exempt from the waiver rule we announce here. But clearly this is not that case.

\* \* \* \* \* \*

In light of our analysis, we affirm the $10,000 verdict against West and reverse and

---

**41.** Theoretically, there are four possible ways to deal with inconsistent verdicts: (1) add together the individual verdicts and award the sum against all defendants, jointly and severally, *see, e.g., Atherton v. Crandlemire*, 140 Me. 28, 33 A.2d 303, 304–05 (1943); *Weddle v. Loges*, 52 Cal. App.2d 115, 125 P.2d 914, 916–17 (1942); (2) award against all *defendants, jointly and severally, the largest of the individual verdicts, see, e.g., Faison v. Nationwide Mortgage Corp.*, 268 U.S.App.D.C. 1, 8–9, 839 F.2d 680, 687–88 (1987); (3) award against each defendant the smallest of the individual verdicts; *see, e.g., Siebrand v. Gossnell*, 234 F.2d 81, 89 (9th Cir.1956); *Wear–U–Well Shoe Co. v. Armstrong*, 176 Ark. 592, 3 S.W.2d 698, 700 (1928); or (4) order a new trial on damages. *See, e.g., Greet v. Otis Elevator Co.*, 187 A.2d 896, 898 (D.C.1963); *City of Hialeah*, 166 So.2d at 609. *See generally* Mary J. Cavins, Annotation, *Propriety and Effect of Jury's Apportionment of Damages As Between Tortfeasors Jointly and Severally Liable*, 46 A.L.R.3d 801 (1972).

The cases authorizing a court to total the damages (typically where the jury states both a lump sum and apportions), *see Atherton*, 33 A.2d at 304–05; *Weddle*, 125 P.2d at 916–17, as well as those calling for award of the largest of the verdicts against all defendants, *see Faison*, 268 U.S.App.D.C. at 8–9, 839 F.2d at 687–88, are typically limited to cases involving joint and several liability of active tortfeasors, not derivative liability. *But see Kinsey v. William Spencer & Son Corp.*, 165 Misc. 143, 300 N.Y.S. 391, 397

(Sup.Ct.1937) (applying rule for joint tortfeasors to master and servant and allowing plaintiff to recover largest sum found against any defendant), *aff'd mem.*, 255 A.D. 995, 8 N.Y.S.2d 529 (1938), *aff'd mem.*, 281 N.Y. 601, 22 N.E.2d 168 (1939).

In contrast, in cases involving derivative liability under the doctrine of *respondeat superior*, the master's liability is limited to that of the servant, the only active tortfeasor, which commonly results in entry of a lower judgment against the master than the jury awarded. *See, e.g., Citizens Coach Co. v. Wright*, 228 Ark. 1143, 313 S.W.2d 94, 97–98 (1958) (holding $5,000 verdict against transit company, premised on injury caused by fellow passenger, "grossly excessive" when compared with $500 verdict against passenger and reducing judgment against company to $500); *Wear–U–Well*, 3 S.W.2d at 700 (modifying jury verdict of $750 against tortfeasor and $1,750 against corporate defendant, which was only derivatively liable, to lower sum of $750 against each). New trials on damages have been awarded in *respondeat superior* cases, however, where the range of the jury's awards is wide. *See Hialeah*, 166 So.2d at 609 ("ordinarily the defect could be remedied, without retrial, by the entry of a judgment against both defendants for the amount found against the active tortfeasor," but a new trial should be ordered when "the discrepancy between the verdicts is so great as to indicate a clear disregard by the jury of the instructions of the trial judge").

remand for reinstatement of the $425,000 verdict against the Credit Union (NCUA).[42]

*So ordered.*

STEADMAN, Associate Judge, concurring in part and dissenting in part:

I join Judge Ferren's thorough analysis of the issues dealt with in Parts I, II, IV, and V of his opinion for the court. With respect to Part III, however, I would affirm the trial court's determination that the doctrine of primary jurisdiction required that the plaintiff first seek relief under the workers' compensation act.

As Judge Ferren points out in Part IIIA and as we have repeatedly iterated, under that doctrine "when there is a substantial question as to whether an employee's injuries are covered by an employment compensation statute, the employee must first pursue a remedy under the statute, thereby permitting the agency to make the initial decision concerning coverage." *Grillo v. National Bank of Washington*, 540 A.2d 743, 749 (D.C. 1988) (internal punctuation and citations omitted). Furthermore, "a substantial question will exist unless the injuries were *clearly* not compensable under the statute." *Harrington v. Moss*, 407 A.2d 658, 661 (D.C.1979) (internal punctuation and citations omitted).

Here, the plaintiff suffered a serious disabling injury as a result of the workplace actions of her superior, the chairman of the board of the Credit Union. Judge Ferren may well be correct in his painstaking analysis of our workers' compensation act in which he concludes that such injury is not compensable under the act. But the very length of his analysis belies any assertion that the act "clearly" does not apply.[1]

I cannot read our decision in *King v. Kidd*, 640 A.2d 656 (D.C.1993), as conclusively resolving the issue. That case involved the interplay between a sexual harassment claim and the personnel grievance portion of the act governing public employees, not the disability portion. As we pointed out in a prior case, "[t]hese two groups of CMPA provisions ... clearly have altogether different subject matters and purposes," and "have altogether different legislative antecedents." *District of Columbia v. Thompson*, 593 A.2d 621, 630 (D.C.), *cert. denied*, 502 U.S. 942, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991) (*"Thompson II"*). Furthermore, *King* was an action between co-workers and did not address the issue of the liability of the employer, who was not a party to the appeal.

Nor do I think that the other considerations set forth by Judge Ferren settle the matter. The "irony" of providing employees who suffer serious workplace physical or mental disabilities with automatic coverage under workers compensation while permitting other emotional distress claims to go to court seems built into the distinction established by *District of Columbia v. Thompson*, 570 A.2d 277 (D.C.1990), *aff'd in part and vacated in part*, 593 A.2d 621 (1991) (*"Thompson I"*), and it is not immediately obvious why such disability caused by sexual harassment should be treated differently for purposes of workers' compensation coverage. Indeed the very system of workers' compensation carries with it both the possibility of limited recovery and the need of multiple fora for complete resolution of workplace injury. *See, e.g., Meiggs v. Associated Builders, Inc.*, 545 A.2d 631 (D.C.1988) (injured

---

42. Judge STEADMAN'S dissent as to Part III of this opinion is premised not on any disagreement with the analysis but on a belief that any explication as long and complicated as Part III necessarily suggests that it cannot be "clear" the WCA is inapplicable. The extensive analysis in Part III, however, is not so much an application of law to facts as was called for in *Thompson I*, 570 A.2d at 285–86 (concerning whether mental injuries were disabling within meaning of CMPA); *see Thompson II*, 593 A.2d at 635 (reaffirming Part II of *Thompson I* ruling on CMPA disability provisions). Rather, Part III sorts out this court's prior decisions in a complicated legal area—almost a purely legal analysis as in *New-*

man, 518 A.2d at 705–06—that this court, far more than DOES, is equipped to do, and has jurisdiction to do, in the first instance.

1. "If a substantial portion of the complaint [seeking damages for sexual harassment in the workplace] involves physical injury, *or the kind of mental or nervous injury or emotional distress compensable under the Act*, most states will hold the action to that extent banned." 2A ARTHUR LARSON, THE LAW OF WORKMEN'S COMPENSATION § 68.34(d), at 13–231 to 13–235 (1993) (emphasis in original; footnotes omitted).

employees of subcontractors who had received compensation under the WCA can maintain suit against general contractors for negligence), *cert. denied,* 490 U.S. 1116, 109 S.Ct. 3178, 104 L.Ed.2d 1040 (1989).

As I already suggested, Judge Ferren in the end may be entirely correct in all the considerations he raises and in his resolution of each of the foregoing issues. Indeed, the administrative agency might agree with him with respect to some or all of them. I believe, however, that such judicial analysis should be informed by the administrative input which the doctrine of primary jurisdiction is intended to ensure. I would affirm the trial court's ruling on that issue.